**No. 25-1960 / No. 25-2010**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

---

**ALTER DOMUS LLC,**

**Plaintiff-Counter Defendant - Appellant**

**v.**

**LARRY J. WINGET,**

**Defendant – Appellee,**

**JVIS-USA, LLC,**

**Defendant-Counter Plaintiff - Appellee**

_____

On Appeal from the United States District Court for the
Eastern District of Michigan, the Honorable David M. Lawson, Presiding
Case No. 2:23-CV-10458

_____

**BRIEF OF APPELLANT
ALTER DOMUS LLC**

James W. Ducayet
Kendra L. Stead
Jennifer M. Wheeler
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000

*Counsel for Alter Domus LLC*

# TABLE OF CONTENTS

**Page**

STATEMENT REGARDING ORAL ARGUMENT ............................................... vi

JURISDICTIONAL STATEMENT ...........................................................1

STATEMENT OF THE ISSUES.............................................................2

INTRODUCTION ........................................................................3

STATEMENT OF THE CASE...............................................................6

    A.    Winget and the Trust Default on a Guaranty and the Agent Wins a Full-Recourse Judgment Against the Trust. ......................................6

    B.    Winget Revokes the Trust and Causes Formerly Trust-Held Companies to Distribute Hundreds of Millions Worth of Notes and Cash. ..............................................................................8

    C.    The District Court Imposes a Constructive Trust Over the Revocation Period Distributions, and This Court Affirms in Relevant Part. ....................................................................10

    D.    The Agent Brings Action Against JVIS and Winget to Enforce the Notes, and JVIS Asserts Counterclaims.......................................11

    E.    Discovery Confirms That Defendants Amended the Notes to Thwart the Agent's Recovery Efforts and Reveals That Winget Had Received an Additional $22.5 Million of Payments. ..................12

    F.    The Agent Seeks to Exclude Testimony of JVIS's Expert. ................14

    G.    The District Court Holds a Bench Trial. .............................................15

    H.    The District Court Rules in the Agent's Favor on Two Claims, but Declares the Notes Invalid as an Unauthorized Distribution........17

SUMMARY OF THE ARGUMENT ......................................................17

STANDARD OF REVIEW ...............................................................19

ARGUMENT ................................................................................................19

I.    The District Court Erred in Allowing JVIS to Use Section 307 to Support its Counterclaim and Defense. .........................................................19

II.   The District Court Erred in Holding That JVIS Had Satisfied the Statutory Test to Establish That the Notes Rendered JVIS Insolvent. ..........25

      A.    The District Court Erred in Holding That JVIS's Expert's Single Method for Calculating Insolvency Was Sufficient to Demonstrate That the Notes Were Prohibited Distributions. .............29

      B.    The District Court Erred in Relying on JVIS's Expert's Testimony Because the Expert Failed to Consider JVIS's Total Assets. ................................................................................................33

      C.    JVIS's Expert's Method Was Not Reasonable Under the Circumstances. .................................................................................37

            1.    JVIS's Expert Unreasonably Combined Book Value and Market Value, Resulting in a Meaningless Calculation. ..........37

            2.    JVIS's Expert's Market Valuation Employed Unreasonable and Incorrect Assumptions. ..............................39

      D.    The District Court Erred in Finding That the Agent Had Not Presented Any Evidence of JVIS's Solvency. ...................................43

III.  The District Court Erred in Not Barring the Counterclaim Under Unclean Hands and Waiver. ..............................................................................45

      A.    Unclean Hands Bars the Counterclaim. .............................................46

      B.    JVIS Waived the Counterclaim. ........................................................50

IV.   The District Court Committed Legal Error in Refusing to Award the Agent Damages Up to the Point of JVIS's Purported Insolvency. ...............52

CONCLUSION ...........................................................................................55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*BIGResearch, L.L.C. v. PENN, L.L.C.*,
  2012 WL 2524250 (Ohio Ct. App. June 29, 2012) ...........................................54

*Broad. Music, Inc. v. Roger Miller Music, Inc.*,
  396 F.3d 762 (6th Cir. 2005) .......................................................................19

*Charbonneau v. Mary Jane Elliott, P.C.*,
  611 F. Supp. 2d 736 (E.D. Mich. 2009) ........................................................51

*In re Chemours Co. Derivative Litig.*,
  2021 WL 5050285 (Del. Ch. Nov. 1, 2021) .....................................................31

*Chesnut v. United States*,
  15 F.4th 436 (6th Cir. 2021) ........................................................................19

*In re Clouter Creek Reserve LLC*,
  669 B.R. 764 (D.S.C. Bankr. 2025) ................................................................35

*Dillard v. Schlussel*,
  865 N.W.2d 648 (Mich. Ct. App. 2014) .........................................................49

*Exela Pharma Scis., LLC v. Eton Pharms., Inc.*,
  2022 WL 806524 (D. Del. Feb. 8, 2022) .........................................................30

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
  2015 WL 640875 (S.D.N.Y. Feb. 16, 2015) .....................................................29

*Florence Cement Co. v. Vettraino*,
  807 N.W.2d 917 (Mich. Ct. App. 2011) ..........................................................21

*Hiscock v. Hiscock*,
  240 N.W. 50 (Mich. 1932) ...........................................................................51

*JPMorgan Chase Bank, N.A. v. Winget*,
  2022 WL 2389287 (6th Cir. July 1, 2022) .................................................*passim*

*JPMorgan Chase Bank, N.A. v. Winget*,
　602 F. App'x 246 (6th Cir. 2015) ............................................................................8

*JPMorgan Chase Bank, N.A. v. Winget*,
　No. 08-cv-13845 (E.D. Mich.)...................................................................*passim*

*Klang v. Smith's Food & Drug Ctrs., Inc.*,
　702 A.2d 150 (Del. 1997) ......................................................................31

*In re Lyondell Chemical Co.*,
　567 B.R. 55 (Bankr. S.D.N.Y. 2017)................................................37

*McFerren v. B & B Inv. Grp.*,
　655 N.W.2d 779 (Mich. Ct. Ap. 2002)............................................47

*Meeks v. PRN, Inc.*,
　35 F.3d 571, 1994 WL 467991 (9th Cir. Aug. 30, 1994) .................31, 32, 34, 35

*In re Michigan Mach. Tool Contract Corp.*,
　381 B.R. 657 (E.D. Bankr. Mich. 2008)...........................................24

*In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig.*,
　341 F. Supp. 3d 213 (S.D.N.Y. 2018) ..............................................37

*Osborn v. Griffin*,
　865 F.3d 417 (6th Cir. 2017) ..........................................................19

*In re Paoli R.R. Yard PCB Litig.*,
　1992 WL 323531 (E.D. Pa. Oct. 21, 1992) ......................................43

*Paratransit Risk Retention Grp. Ins. Co. v. Kamins*,
　160 P.3d 307 (Colo. App. 2007)...................................................54, 55

*Reed Est. v. Reed*,
　810 N.W.2d 284 (Mich. Ct. App. 2011)...........................................51

*Rose v. Nat'l Auction Grp., Inc.*,
　646 N.W.2d 455 (Mich. 2002).........................................................47

*Simon v. Gebremariam*,
　2020 WL 10142203 (Mich. Ct. App. Dec. 10, 2020).....................21, 22, 23, 25

*Winget v. JPMorgan Chase Bank, N.A.*,
  15-cv-13469 (E.D. Mich. Nov. 16, 2015), ECF No. 11 ......................................9

*Winget v. JPMorgan Chase Bank, N.A.*,
  2007 WL 715342 (E.D. Mich. Mar. 7, 2007), *aff'd*, 537 F.3d 565
  (6th Cir. 2008) ......................................................................................................7

**Statutes**

28 U.S.C. § 1291 ....................................................................................................1

28 U.S.C. § 1332(a) ...............................................................................................1

MCL § 450.1345(3) ..............................................................................................24

MCL § 450.4102(g) ..............................................................................................22

MCL § 450.4307 ..........................................................................................*passim*

MCL § 450.4308 ...................................................................................................21

MCL § 450.4308(1) .........................................................................................53, 55

Michigan Business Corporations Act ...................................................................24

Oregon Compiled Laws § 60.181(3) ....................................................................32

Securities Act § 12(a)(2) ......................................................................................30

**Other Authority**

Fed. R. Evid. 702 .........................................................................................*passim*

Case: 25-1960    Document: 22    Filed: 01/20/2026    Page: 7

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellant Alter Domus LLC respectfully requests oral argument. Appellant is appealing the decision below on several different grounds, including findings made following a trial, and believes that the panel may benefit from oral argument.

vi

## JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a). Plaintiff Alter Domus LLC and Defendants Larry J. Winget and JVIS-USA, LLC are citizens of different states, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 because the district court's order entering judgment is a final decision. (Judgment, RE 292, PageID.5917.) Appellant timely filed its notice of appeal on October 23, 2025. (RE 293, PageID.5918.)

## <u>STATEMENT OF THE ISSUES</u>

1.      Whether the district court erred in granting judgment for JVIS on its Counterclaim seeking invalidation of the Notes, where the Notes were held by the Agent, which is not a member of the LLC, and the provision of the Michigan LLC Act that JVIS's Counterclaim and affirmative defense relied on does not permit a court to invalidate a distribution in the hands of a nonmember?

2.      Whether the district court erred in concluding that JVIS satisfied the statutory test under the Michigan LLC Act for establishing that the Notes' issuance rendered JVIS insolvent?

3.      Whether the district court erred in failing to find that JVIS's Counterclaim is barred by the equitable doctrines of unclean hands and waiver?

4.      Whether the district erred in failing to follow the text and structure of the Michigan LLC Act by declining to enforce the amounts owed to the Agent under the Notes up to the point of JVIS's purported insolvency?

## **INTRODUCTION**

This appeal is about two promissory notes. JVIS-USA LLC ("JVIS") issued the notes to its founder, Larry J. Winget and his trust ("Winget"), in 2017 with a face value of $150 million. Shortly after issuance, JVIS repeatedly took steps to recognize the notes' validity. First, JVIS paid $22.5 million on the notes immediately after they were issued, and it paid another $22.5 million in the months and years that followed. Second, JVIS entered into a security agreement acknowledging that all of JVIS's present and future property secured the notes. Third, JVIS described the notes in an internal company document as a valid "distribution," and also agreed in other documents dated three years *after* issuance that the notes "shall remain in full force and effect."

Starting in 2020, however, JVIS and Winget realized that the notes were going to be assigned (and eventually were assigned) to Alter Domus LLC (the "Agent") by court order. Knowing that the Agent would seek to collect on the notes as the new obligee, JVIS and Winget decided to change course. According to their own contemporaneous e-mails and memoranda (which the district court ordered produced under the crime-fraud exception to the attorney-client privilege), JVIS and Winget jointly concocted a "strategy to prevent [the Agent] from enforcing the notes," in order to "thwart[], for at least the next 3 years, [the Agent's] ability to enforce the notes." Acting on that plan, JVIS and Winget amended the notes in 2020

3

to make them harder to enforce and less valuable by the time the Agent took possession of them. JVIS also let the security agreement lapse just before the Agent became the new obligee. And when the Agent obtained the notes in 2023 and demanded that JVIS pay the amounts due, JVIS refused, claiming for the very first time—and roughly six years after the notes were issued—that the notes were never valid in the first place because they rendered JVIS insolvent in 2017.

Despite all this, and notwithstanding that the district court concluded after trial the Agent had proven its breach of contract and fraudulent transfer claim against JVIS, the court nevertheless allowed JVIS to escape liability. Specifically, after trial, the district court granted JVIS's counterclaim asserting that the notes were invalid "distributions" in 2017 under Section 307 of the Michigan LLC Act. This meant that the notes—which this Court previously decided belong to the Agent as part of its enforcement efforts—could no longer be enforced. The district court erred in so ruling.

First, JVIS's counterclaim and related affirmative defense based on Section 307 never should have reached trial. As the Michigan Court of Appeals has held, Section 307 does not permit a court to invalidate a distribution (such as the notes) in the hands of a third party (such as the Agent). Yet that is precisely what the district court did when it granted JVIS's Counterclaim and invalidated the notes

4

already in the hands of the Agent. This is a pure issue of the law that warrants reversal.

Second, even if the Counterclaim and related affirmative defense were properly asserted under Section 307, the district court improperly determined what JVIS was required to establish under the statute. Specifically, JVIS's own consolidated financial statements showed that JVIS was not rendered insolvent by issuing the notes in 2017. That too forecloses as a matter of law JVIS's claim that the notes were prohibited distributions. Moreover, JVIS relied at trial on the bespoke methodology of a retained expert admitted over objection. This testimony was unreliable and insufficient as a matter of law because it was not consistent with the statutory tests for solvency under Section 307. Further, the methodology was riddled with internal inconsistences and flaws at odds with basic valuation principles, as demonstrated by the *same expert's* non-litigation valuation of JVIS, in which he valued JVIS's equity at more than *twice* the face value of the notes.

Third, the district court erred by failing to bar JVIS's Counterclaim under the doctrines of unclean hands and waiver. The undisputed facts at trial showed that when the notes remained in Winget's hands over a period of several years, JVIS recognized them as distributions, paid $45 million on them, and reaffirmed them through amendments in 2020. Yet as soon as it became clear that the notes would fall into the Agent's hands, JVIS switched gears by engaging in a scheme—as

revealed by the crime-fraud documents—to "thwart[], for at least the next 3 years, [the Agent's] ability to enforce the notes." As part of that plan, JVIS intentionally let the security agreement covering the notes lapse, further hindering the Agent's enforcement. This smoking gun evidence led the district court to find that the Agent had established its fraudulent-transfer claim. Yet the district declined to use the same evidence to establish unclean hands and waiver.

Lastly, the district court refused to enforce the notes up to the point of JVIS's insolvency. Put differently, even if the district court did not err in concluding that the notes rendered JVIS insolvent under Section 307, the district court erred in failing to require JVIS to pay the Agent the amount due on the notes up to the amount that purportedly rendered JVIS insolvent. That result is consistent with the text, structure, and overall purpose of Michigan's LLC Act. The court erred when it declined to do so.

The ruling in JVIS's favor on its Counterclaim should be reversed, and the case should be remanded with an instruction to enter judgment in the Agent's favor in an amount consistent with the trial proofs.

## STATEMENT OF THE CASE

### A.     Winget and the Trust Default on a Guaranty and the Agent Wins a Full-Recourse Judgment Against the Trust.

The Agent appeals from a trial that resulted from its ongoing efforts to collect on a substantial judgment against Winget and the Larry J. Winget Living Trust (the

"Trust"). The underlying dispute arose in 2003, when a group of companies owned by either Larry J. Winget or the Trust filed for bankruptcy. (*JPMorgan Chase Bank, N.A. v. Winget*, No. 08-cv-13845 (E.D. Mich.) ("2008 Case"), Complaint, RE 1, PageID.3.).) Before the bankruptcy, a group of lenders represented by an Administrative Agent extended those companies a nearly half-billion-dollar line of credit through a Credit Agreement. (*Id.*) In connection with that facility, Winget and the Trust entered a Guaranty, under which they each guaranteed the obligations and partially secured them through a pledge of assets. (*Id.* at PageID.4.) The bankruptcy was an event of default under the Credit Agreement, accelerating all obligations. (*Id.* at PageID.5.) After the bankruptcy sale, the Agent and lenders were still owed over $300 million under the Credit Agreement, which accrued interest. *Winget v. JPMorgan Chase Bank, N.A.*, 2007 WL 715342, at *2 (E.D. Mich. Mar. 7, 2007), *aff'd*, 537 F.3d 565 (6th Cir. 2008).

The Agent sued to enforce the Guaranty for the unpaid amounts. (Complaint, 2008 Case RE 1.) Winget and the Trust contested liability. (Answer, 2008 Case RE 8, PageID.71.) The parties also litigated a provision that limited the Agent's recourse against Winget to $50 million but did not contain a corresponding limitation as to the Trust. (Guaranty, 2008 Case RE 1-3, PageID.20-21.) In 2012, the district court held that Winget was liable for $50 million pursuant to the Guaranty, and reformed the Guaranty to limit the Agent's recourse against the Trust to $50 million.

7

(Decision on Reformation, 2008 Case RE 365, PageID.13839-40; Order Granting Final J., 2008 Case RE 469.)

In 2015, this Court reversed the reformation, holding that the Guaranty did not limit the Agent's recourse against the Trust. *JPMorgan Chase Bank, N.A. v. Winget*, 602 F. App'x 246, 258-59 (6th Cir. 2015). The district court entered an Amended Final Judgment in July 2015. (Am. Final J., 2008 Case RE 568, PageID.24046.)

### B. Winget Revokes the Trust and Causes Formerly Trust-Held Companies to Distribute Hundreds of Millions Worth of Notes and Cash.

With the Amended Final Judgment in place, the Agent commenced collection against the Trust. (*See, e.g.*, Notices of Judgment Lien, 2008 Case RE 627-34.) But then, in August 2015, counsel for Winget and the Trust informed the Agent for the first time that Winget had revoked the Trust about 18 months earlier, retitling the formerly Trust-held corporations and LLCs in his name. (Letter to Agent, 2008 Case RE 771-5, PageID.26959.)

The Agent asserted that this conduct was a fraudulent transfer. (Answer and Counterclaims, *Winget v. JPMorgan Chase Bank, N.A.*, 15-cv-13469 (E.D. Mich. Nov. 16, 2015), ECF No. 11; *see also* Order Consolidating Cases, 2008 Case RE 686, PageID.25026.) Subsequent discovery revealed that Winget had caused formerly Trust-owned LLCs to distribute hundreds of millions of dollars in cash and

8

promissory notes to him following the revocation of the Trust. *JPMorgan Chase Bank, N.A. v. Winget*, 2022 WL 2389287, at \*6 (6th Cir. July 1, 2022). The distributions included promissory notes from JVIS, a manufacturing company that specializes in automotive components.

At issue here are two promissory notes: one to a Grantor Retained Annuity Trust (the "GRAT") that Winget had formed during the Revocation Period, and the other to Winget personally (collectively the "Notes"). (Pl's Tr. Exs. 1-2, RE 282-1, 282-2, PageID.5024-5029.) The GRAT Note had a face value of $135 million and the Winget Note had a face value of $15 million. (*Id.*) JVIS also entered a Security Agreement acknowledging that all of JVIS's present and future property, tangible and intangible, would secure the Notes. (Pl's Tr. Ex. 56, RE 282-19, PageID.5395.)

In July 2017, the district court held that Winget had engaged in a constructively fraudulent transfer by revoking the Trust. (Fraudulent Transfer Ruling, 2008 Case RE 732.) Then, in the middle of damages discovery on that claim, Winget *sua sponte* reinstated the Trust, representing to the court that he had returned it to "exactly the condition it was held" before the Revocation. (Notice, 2008 Case RE 777, PageID.27032.) That was not accurate. Winget did not return the cash or note distributions or any payments on the Notes to the Trust during the revocation period.

9

### C.     The District Court Imposes a Constructive Trust Over the Revocation Period Distributions, and This Court Affirms in Relevant Part.

Because Winget did not return the distributions to the re-formed Trust, the Agent sought a constructive trust over them, including the JVIS Notes. (Mot. for Partial Summary Judgment, 2008 Case RE 926.) On January 5, 2021, the district court adopted the March 2020 report and recommendation of a special master, and ordered Winget to assign the JVIS Notes to the Agent and "pay [the Agent] the amounts paid on the promissory notes, including the $22.5 million payment" (the "Turnover Order"). (2008 Case RE 986, PageID.31897.) This Court upheld the district court's ruling in all respects relevant to this appeal. *Winget*, 2022 WL 2389287, at *9.

After this Court ruled, the Agent received the Notes out of escrow. At that point, the Agent learned for the first time that JVIS and Winget had secretly amended the Notes in June 2020—three months *after* the Special Master recommended assigning them to the Agent (the "Amendments"). The Amendments left JVIS's payment obligation intact, but altered the Notes' terms to make them far less favorable to the noteholder. Specifically, the Amendments extended the Notes' maturity date from 2020 to 2023, waived accrued interest and prior defaults, and removed the noteholder's right to call the Notes for the full amount outstanding. (Pl's Tr. Ex. 3, RE 282-3; Pl's Tr. Ex. 4, RE 282-4.) When JVIS amended the Notes

10

in 2020, it did not seek to avoid them on the grounds that they had been issued in violation of the Michigan LLC Act or that they were otherwise unenforceable. To the contrary, JVIS stated in the Amendments that the Notes "shall remain in full force and effect, as amended hereby." (Pl's Tr. Ex. 3, RE 282-3, PageID.5030; Pl's Tr. Ex. 4, RE 282-4, PageID.5032).

**D.    The Agent Brings Action Against JVIS and Winget to Enforce the Notes, and JVIS Asserts Counterclaims.**

In February 2023, the Agent filed a complaint asserting claims for fraudulent transfer and unjust enrichment based on the Amendments to the JVIS Notes (Complaint, RE 1), and later added a claim for breach of contract (Amended Complaint, RE 46.) JVIS filed two counterclaims. JVIS's first counterclaim sought declaratory relief, asserting that the Notes' issuance violated the Michigan LLC Act by causing JVIS's liabilities to exceed its assets at the time of issuance in June 2017, making them prohibited distributions. (JVIS Counterclaims, RE 16 at PageID.53-54.) JVIS asserted this claim despite the fact that JVIS has remained a going concern since June 2017 and has not filed for bankruptcy at any relevant time. JVIS's second counterclaim sought to recover the $22.5 million in then-disclosed payments on the Notes which the Agent had already received pursuant to the affirmed Turnover Order based on the same provision. (*Id.* at PageID.54-55.)

The district court dismissed JVIS's counterclaim to recover the $22.5 million of then-disclosed past payments, explaining that "Michigan's courts have held that

11

its LLC statute does not create a cause of action for the return of distributions already in the possession of a third party." (MTD Opinion, RE 85, PageID.824.) The district court nonetheless allowed JVIS's invalidity counterclaim to proceed to discovery. (*Id.* at PageID.825.)

**E.      Discovery Confirms That Defendants Amended the Notes to Thwart the Agent's Recovery Efforts and Reveals That Winget Had Received an Additional $22.5 Million of Payments.**

The parties proceeded to discovery. Discovery revealed three notable issues relevant here.

First, the same year that the Notes were issued—2017—a professional advisory firm conducted a valuation of JVIS which showed that the company had a business enterprise value of $444.5 million as of July 1, 2016, with a fair market value of equity of $386,166,682 ("2017 Valuation"). (Pl's Tr. Ex. 62, 2017 Valuation, RE 282-22 at PageID.5438.) Both amounts are more than twice the $150 million face value of the Notes.

JVIS and Winget objected to the Agent's use of this valuation in this proceeding. Magistrate Judge Grand disagreed, ordering the production of the 2017 Valuation for use in this litigation, noting that "between the financial information reflected therein and the temporal proximity of its preparation to the Notes' issuance and the valuation date, the Report contains information that bears on JVIS' insolvency arguments. For example, the JVIS Valuation Report concluded that

12

JVIS's value as of July 2016 was more than twice the $150,000,000 Notes' face value, and an accountant or other financial expert could use the information in the Report, along with other salient economic and financial information, to opine on the reasonableness of JVIS' contention that the Notes' issuance about a year later, on June 29, 2017, rendered JVIS insolvent." (RE 157, PageID.2191.)

Second, in connection with its fraudulent conveyance and unjust enrichment claims, the Agent requested all documents related to the Amendments. In response, JVIS and Winget resisted the production of certain communications and memoranda, claiming privilege over them. However, after protracted motion practice, the magistrate judge found (and the district court affirmed) that the documents "contain[ed] evidence of an apparent intent to hinder, delay, or defraud the Agent by way of the transfers" at issue in this matter, and "were reasonably related to the preparation or furtherance of those transfers." (RE 250 at PageID.3752.) As a result, the district court ordered these documents produced in the middle of trial under the crime-fraud exception (hereinafter the "Crime-Fraud Documents").

The Crime-Fraud Documents included emails and memos from around the time of the Amendments in 2020 stating, among other things, that JVIS had sufficient property to cover the outstanding balances on the Notes (Pl's Tr. Ex. 140, Memo, RE 282-62, PageID.5622), but that calling the Notes could ultimately

"benefit [the Agent]." (*Id.* at PageID.5623.) The documents recommended that, instead of cancelling the Notes, JVIS and Winget deploy a "strategy to prevent Chase from enforcing the notes," explaining that amendments would "thwart[], for at least the next 3 years, [the Agent's] ability to enforce the notes." (Pl's Tr. Ex. 106, Memo, RE 282-28, PageID.5475-76.)

Third, discovery and motion practice revealed $22.5 million of *additional* payments on the Notes that Winget had not delivered to the Agent, despite the Turnover Order affirmed by this Court and discussed *supra*. The Agent obtained a contempt order against Winget in the 2008 Action for violating the Turnover Order by concealing and then failing to deliver the additional payments to the Agent. (*Id.*)

### F.   The Agent Seeks to Exclude Testimony of JVIS's Expert.

In advance of trial, the Agent sought to exclude the testimony of JVIS's retained expert, Gregory Light, under Federal Rule of Evidence 702 because his proffered opinion was based on an erroneous reading of the Michigan LLC Act and he used an unreliable methodology. (Mot. Exclude, RE 121.) Before Light was retained to serve as JVIS's expert, he worked at the professional services firm that authored the 2017 Valuation and he helped draft the report and signed it. The district court allowed Light to testify, although he was ordered to sit for a second deposition to respond to questions about the 2017 Valuation that he had refused to answer during his first deposition. (*Id.*)

14

**G. The District Court Holds a Bench Trial.**

In February 2025, the district court held a four-day bench trial. JVIS's managers, Timothy Bradley and Nicholas DeMiro, testified regarding the Notes' issuance and amendments, JVIS's structure and operations, and JVIS's accounting and financial reporting practices. Bradley testified that after the Notes were issued, an internal company document acknowledged that an interest in the non-controlling shares of JVIS had a value of $346 million—i.e., more than twice the value of the Notes. (Transcript, RE 268, PageID.4201, 82:1-4.)

DeMiro testified that JVIS prepares and reviews the results of all three of its operating divisions—Imports, Harper, and its wholly owned subsidiary, Manufacturing—on a consolidated basis. (Transcript, RE 268, PageID.4290, 171:15-19.)

JVIS called its expert, Light, to present his calculation of the difference between JVIS's assets and liabilities after giving effect to the Notes as of their June 30, 2017 issuance date. (Transcript, RE 270.) As stated above, Light had signed the 2017 Valuation that recognized a value of $386 million for JVIS's equity as of July 1, 2016. (Pl's Tr. Ex. 62, 2017 Valuation, RE 282-22, PageID.5438.) For this litigation, however, Light took a different approach. He separated out one division of JVIS (Manufacturing) from the other two divisions (Harper and Imports), performed a market valuation of only Manufacturing, and then "added back" that

15

*market* valuation to the *book* value of Harper's and Imports' balance-sheet assets to calculate the difference between JVIS's assets and liabilities.

Additionally, Light acknowledged that he did not attempt to value JVIS's intangible assets as part of his valuation. (Transcript, RE 270 at PageID.4602-03.) He described his valuation work, and all valuation work, as a "gray area." (*Id.* at PageID.4688.) Light further acknowledged that, if just two of the many judgment calls he had applied to his valuation of Manufacturing were tweaked, his overall result would flip to show JVIS's assets exceeding its liabilities—i.e., solvency— under even his own made-for-litigation methodology. (*Id.* at PageID.4629-53.)

The Agent presented a rebuttal valuation expert, Timothy Meinhart, who opined that Light's methodology was deeply flawed and inconsistent with valuation principles. Among other critiques, Meinhart explained that Light's mixing of book value and market value yielded a nonsensical result; that fact witness testimony demonstrated JVIS possessed substantial intangible assets; and that various assumptions Light made in his valuation of Manufacturing were unreasonable and dramatically lowered his calculated value. (*See e.g.*, Transcript, RE 273, PageID.4780-81 (explaining mixed approach is unreliable), PageID.4777 (explaining JVIS has substantial intangible assets), PageID.4800-25 (detailed criticism of Light's size adjustment factor and discount for lack of marketability).)

16

**H.    The District Court Rules in the Agent's Favor on Two Claims, but Declares the Notes Invalid as an Unauthorized Distribution.**

On September 30, 2025, the district court issued its ruling. It concluded that the Agent had proven the elements of its breach of contract claim (Count 1) and its fraudulent transfer claim (Count 2). (RE 291, PageID.5902-05.) However, it ruled in JVIS's favor on the remaining Counterclaim, holding the Notes "void and unenforceable," because JVIS's "total assets were less than the sum of its total liabilities" as of June 29, 2017. (*Id.* at PageID.5915-16.) Accordingly, the district court concluded that the Agent could not enforce the Notes and dismissed the Complaint. (*Id.*; *see also* Judgment, RE 292, PageID.5917.)

The Agent took this appeal.

## SUMMARY OF THE ARGUMENT

1.    JVIS's Counterclaim and defense based on Section 307 of Michigan's LLC Act, MCL § 450.4307, fail as a matter of law. The statute provides no cause of action to recover distributions held by nonmembers of JVIS, including the Agent. The Notes themselves were "distributions" under the statute, effective upon issuance in June 2017. Those distributions were assigned by court order to the Agent, and affirmed by this Court, and therefore cannot be invalidated under Section 307. The Counterclaim and related defenses should have been dismissed.

2.    JVIS failed to establish that the Notes were prohibited distributions under the Counterclaim. To support its Counterclaim, JVIS relied solely on the

17

analysis of Light, which was legally and methodologically deficient. Light did not rule out solvency using other reasonable methods, including the consolidated financial statements prepared outside the context of litigation reflecting JVIS's solvency. Light's methodology was also flawed because (1) it failed to assess "total assets," as required by Section 307, by excluding intangible value; and (2) it inconsistently mixed book value and a depressed market valuation for JVIS Manufacturing, driven by unreasonable assumptions that, when reversed, flipped the result to solvency. The district court compounded these errors by effectively shifting the burden to the Agent to provide an "alternative valuation."

3.      JVIS's Counterclaim is barred by unclean hands and waiver. JVIS only invoked the alleged illegality of the Notes after they were assigned to the Agent years later, and after it engaged in conduct aimed at frustrating collection, including bad-faith amendments and undisclosed payments. JVIS also waived any challenge to the Notes by making substantial payments on them, by reaffirming the Notes' validity through the Amendments, and by acknowledging the Notes as distributions before adopting its litigation posture in this case.

4.      At a minimum, the Notes were enforceable up to the point of any proven insolvency and there was no basis to void them in their entirety. Where it applies, Section 307 of the Michigan LLC Act contemplates recovery up to the

18

amount of what could lawfully be distributed. It does not justify voiding the Notes in full. The district court erred in denying recovery up to that amount.

## STANDARD OF REVIEW

A district court's interpretation of a statute is reviewed *de novo*. *See Broad. Music, Inc. v. Roger Miller Music, Inc.*, 396 F.3d 762, 769 (6th Cir. 2005). Conclusions of law are reviewed *de novo* too. *Chesnut v. United States*, 15 F.4th 436, 441 (6th Cir. 2021). "In a *de novo* review, this Court is required to answer the same question as presented to the district court without any deference." *Id.* Thus, the district court's conclusions described below in Sections I, II, and IV are reviewed *de novo* by this Court, while the district court's factual findings described in Section II are reviewed "for clear error." *Id.* (citation omitted).

Regarding the application of unclean hands and waiver, this Court reviews "a district court's decision to disallow an equitable claim or defense … for abuse of discretion." *Osborn v. Griffin*, 865 F.3d 417, 451 (6th Cir. 2017). As such, the district court's conclusions described in Section III are reviewed for abuse of discretion.

## ARGUMENT

I.     **The District Court Erred in Allowing JVIS to Use Section 307 to Support its Counterclaim and Defense.**

JVIS's Counterclaim and related defense suffer from a fatal legal defect: the provision of Michigan's LLC Act on which they are based, MCL § 450.4307, cannot be asserted to recover distributions (the Notes) that are in the hands of nonmembers

19

(the Agent). Because the Notes were assigned to the Agent—which is not and has never been a member of JVIS—JVIS could not invoke Section 307 to claw back the Notes on the premise that it had violated the Act in issuing them. Accordingly, JVIS's Counterclaim and defense based on Section 307 should have been rejected as a matter of law, and judgment in favor of the Agent's breach of contract claim should have been entered before trial.

More specifically, JVIS's counterclaims alleged that, because the Notes purportedly were issued in violation of the Act, the Notes could not be enforced and JVIS had the right to "recover all distributions made under the Notes." (RE 16, PageID.53-54.) *See also Winget*, 2022 WL 2389287, at *6 (awarding the Agent the Notes and $22.5 million paid on the Notes). The related affirmative defense alleged that the Agent could not collect on the Notes because they were not enforceable based on the operation of Section 307. (RE 15, PageID.45).

Section 307 prohibits LLCs from making distributions to members at the expense of general creditors. MCL § 450.4307. Under this provision, an LLC may not issue a distribution if, after giving the distribution effect, the LLC either would be unable to pay its debts in the usual course of business or the LLC's total assets would be less than its total liabilities. *Id.* § 307(1). Like fraudulent transfer statutes, this provision can be invoked by creditors of an LLC to recover distributions made to members that rendered the LLC insolvent to the detriment of those creditors. *See*

20

*Simon v. Gebremariam*, 2020 WL 10142203, at *4 (Mich. Ct. App. Dec. 10, 2020).

Consistent with this focus on creditor protection, and to ensure that the LLC can honor its obligations to third parties, members of an LLC who assented to an unlawful distribution are jointly and severally liable to the LLC for those distributions. MCL § 450.4308; *see also Florence Cement Co. v. Vettraino*, 807 N.W.2d 917, 926 (Mich. Ct. App. 2011).

Critically, however, Section 307 does not permit actions against *non*members of an LLC to recover an allegedly unlawful distribution that the nonmember lawfully possesses. The Michigan Court of Appeals has addressed this precise question. *Simon*, 2020 WL 10142203, at *4. In *Simon*, the creditor of an LLC sued the former spouse of the LLC's sole member to recover LLC property that was distributed pursuant to a divorce decree. *Id*. at *1-2. The appellate court carefully affirmed the dismissal of the creditor's claim, noting that the spouse "was *never a member* of the LLC" and remarking that it was "not able to find any statute in the [LLC Act], nor any caselaw, imposing liability on a nonmember of an LLC for being the recipient of an improper distribution from that LLC." *Id*. at *4 (emphasis added). That reasoning comports with the purpose of the statute, which is to prevent LLCs from avoiding debts to nonmember general creditors by draining the LLC's assets through distributions to members. As the Michigan Court of Appeals explained, "[Michigan's] Legislature might not have intended for the MLLCA to provide

21

creditors a route to penalize innocent nonmembers of an LLC for the improprieties of its members." That is particularly so because other statutes, such as the fraudulent transfer statute, "specifically preserved creditors' ability to recover in such situations." *Id.*

The Act specifies that, for a distribution of indebtedness (like the Notes), the "effect of a distribution under subsection (1) is measured" when the indebtedness was either "authorized" or "distributed"—not when the underlying debt is paid. MCL § 450.4307(3)(b); *see also* MCL § 450.4102(g).[1] JVIS does not dispute that the Notes were issued on June 29, 2017. (RE 280, PageID.4972.) Under this provision, the Notes constitute LLC distributions, effective as of June 2017. Those distributions were later transferred to the Agent by order of the district court, affirmed by this Court. *Winget*, 2022 WL 2389287, at *6. That should be the end of the matter. The Notes are distributions lawfully held by the Agent, a nonmember of the LLC, and Section 307 accordingly does not permit any action against the nonmember Agent to recover them. *Simon*, 2020 WL 10142203, at *4.

JVIS resisted this straightforward conclusion by arguing that a distribution of indebtedness, in contrast to other forms of distributions, must be measured twice— once when it is distributed and again when some or all of the indebtedness is actually

---

[1] Under the Act, distributions in "all other cases," such as cash distributions, occur when "payment" is made. MCL § 450.4307(3)(c).

22

paid. (*See, e.g.*, RE 98, PageID.1058-59.) The upshot of this argument was that because eventual *payments* on the Notes were not yet in the Agent's hands at the time the Agent demanded payment in 2023, the holding of the Michigan Court of Appeals in *Simon* did not apply. The district court appears to have adopted this formulation, dismissing the counterclaim seeking return of the $22.5 million payment on the Notes, but then refusing to dismiss the counterclaim alleging that the Notes themselves were unenforceable pursuant to Section 307.[2] (RE 85, PageID.822-24; RE 211, PageID.3265.)

This is wrong as a matter of law. Section 307 says clearly that the effective date for an issuance of indebtedness is "the date the indebtedness is authorized," not the date(s) on which it is ultimately paid. MCL § 450.4307(3)(b). Once indebtedness is issued, the holder of that indebtedness (the member) "has the status of, and is entitled to all remedies available to, a creditor of the limited liability company with respect to the distribution." *Id.* § 450.4307(4). Payments on the resulting indebtedness are not *additional* distributions; they are nothing more than a

---

[2] The district court acknowledged that the parties agreed that the issuance of the Notes was a distribution, that the Agent is not a member of the LLC, and that the Act "does not create a cause of action for the return of distributions already in the possession of a third party." (RE 85, PageID.822-24.) Perplexingly, however, the district court did not apply these principles to reach the necessary conclusion that JVIS's invalidity counterclaim and affirmative defenses must be dismissed.

23

satisfaction of the underlying contractual obligation that JVIS undertook when it issued the Notes.

Court interpretations of similar statutes are instructive. The Michigan Business Corporations Act, like Section 307 of the Act, prohibits distributions that would render the corporation insolvent. MCL § 450.1345(3). The Bankruptcy Court for the Eastern District of Michigan interpreted that provision in rejecting the argument that post-issuance payments on promissory notes issued to stockholders constituted distributions that could be recovered if the payments rendered the company insolvent. *In re Michigan Mach. Tool Contract Corp.*, 381 B.R. 657, 670-74 (E.D. Mich. Bankr. 2008). The *Michigan Machine Tool* court concluded that the notes' issuance constituted the distribution, and that distribution was effective as of the date on which the shareholders received the promissory notes. *Id.* at 671-72. Analyzing language in the Business Corporations Act that parallels that of Section 307, the bankruptcy court determined that subsequent "[p]ayments on the notes issued by [the Company] [we]re not prohibited distributions under the Act." *Id.* at 674. It is the issuance of indebtedness that constitutes a distribution, not subsequent payments thereon.

The facts here are simple and undisputed: JVIS issued distributions to its members in the form of promissory notes in June 2017, (RE 280, PageID.4972), and those distributions were assigned to the Agent by operation of a final and non-

24

appealable court order in July 2022. *Winget*, 2022 WL 2389287, at *4. Under Michigan law, once in the hands of the Agent, a nonmember, Section 307 cannot be invoked to void those distributions. *Simon*, 2020 WL 10142203, at *4. Thus, because Section 307 does not apply, there was no need for the district court to assess JVIS's solvency and the Counterclaim should have been dismissed as a matter of law. Judgment should have therefore been entered in favor of the Agent on the contract claim before trial.

## II. The District Court Erred in Holding That JVIS Had Satisfied the Statutory Test to Establish That the Notes Rendered JVIS Insolvent.

JVIS also failed to demonstrate that the Notes were in fact prohibited distributions. Six years after issuing the Notes, JVIS asserted that it issued them in violation of Section 307(1)(b) of the Act (*see* Counterclaim, RE 16, PageID.52), which provides that a distribution will not be made if, "after giving the distribution effect," the "limited liability company's total assets would be less than the sum of its total liabilities." MCL § 450.4307(1)(b).

As discussed below, JVIS's own contemporaneously prepared financial statements showed that, even when giving effect to the Notes, the assets of JVIS exceeded its liabilities. JVIS's only support for its claim to the contrary was the testimony of Light. Because Light's opinions and testimony are the only evidence supporting the district court's decision to declare the Notes void and unenforceable, a somewhat detailed discussion of his methodology is necessary.

Section 307(2) of the Act provides LLCs with a framework to assess whether a contemplated distribution would cause liabilities to exceed assets, and therefore be prohibited. That subsection states that an LLC "may base a determination that a distribution is not prohibited under subsection (1) on financial statements prepared on the basis of accounting practices and principles that are reasonable under the circumstances, on a fair valuation, or on another method that is reasonable under the circumstances." MCL § 450.4307(2).

To assess the difference between JVIS's assets and its liabilities after giving effect to the Notes, Light relied on a method of his own creation, in which he calculated the equity value of two of JVIS's divisions—Harper and Imports—using the ***book*** value of their balance sheet assets and liabilities, then combined that result with what he characterized as a "fair ***market***" value of a third division— Manufacturing—to obtain what he called JVIS's "total concluded equity value." (Light Report, RE 120 at Ex. 3 at 3; *see also* Mot. Exclude, RE 121, PageID.1631.)

This analysis was ***not*** prepared "on the basis of accounting practices and principles that are reasonable under the circumstances," one of the methods contemplated by the statute. MCL § 450.4307(2). It was not disputed at trial that under Generally Accepted Accounting Principles ("GAAP"), to which JVIS is subject, companies typically include, or "consolidate," the results of their wholly owned subsidiaries into the results of the parent company. That means the

26

subsidiaries' assets, liabilities, revenues, and expenses are combined with those held or generated at the parent level in order to present an accurate picture of the company's financial condition. (ASC 810-10-10-1, RE 159-2, PageID.2283.) Rather than treat a wholly owned subsidiary as a discrete "asset" of the parent, the wholly owned subsidiary's financial results are included in those of the parent.

Consistent with GAAP, JVIS consolidates the results of all its operations, including Manufacturing, for internal and external purposes. (Transcript, RE 273, PageID.4781-82, 43:23-44:12.) Internally, JVIS uses consolidated results to understand how the business is performing. (Pl's Tr. Ex. 10, JVIS June 2017 Workbook, RE 282-8, PageID.5043.) Externally, JVIS uses consolidated results for its tax reporting to the IRS. (Light Deposition, RE 121-3, PageID.1672, 55:5–56:2.) Light likewise had used JVIS's consolidated results when he valued the company for non-litigation purposes in 2017. (Transcript, RE 270, PageID.4600, 89:5-15.) And Light acknowledged that, outside of his made-for-litigation methodology, he had not seen any instance of JVIS ever treating Manufacturing as a separate and discrete "asset" of JVIS. (Transcript, RE 270 at PageID.4622, 111:1-13.)

Although Light analyzed JVIS's other assets at their *book* value, he performed a *market* valuation of Manufacturing to determine the value to assign to Manufacturing as an asset of JVIS. (Transcript, RE 270, PageID.4619, 108:11-19.) Critically, that was the only way he could get to a conclusion of insolvency. That is

27

because the book value of Manufacturing was substantially higher than Light's concluded market value. Thus, if he had treated Manufacturing consistent with the other two divisions, Harper and Imports, he would have found solvency. Put differently, Light was forced to deviate from GAAP and JVIS's historical practices as to its own financial statements to reach his "insolvency" conclusion.

The Agent presented several of these defects through its motion to exclude Light from testifying at trial pursuant to Rule 702. (Mot. Exclude, RE 121.) The motion explained that Light's opinion was too narrow to assess whether JVIS had violated the statute; his approach of combining book and market value created a meaningless result; and that his testimony was wholly unnecessary because JVIS's own records showed that JVIS's liabilities did not exceed its assets at the time of issuance, as evidenced by the book value of JVIS as a whole (*Id.* at PageID.1627-28.) The district court denied the Rule 702 motion despite these factually and legally dispositive issues.

Light's trial testimony only further demonstrated that his methodology was results-driven and unsound. When confronted with flaws, errors, and omissions, Light attempted to explain them away with nothing more than his say so, unsupported by any data or analysis. For the reasons detailed *infra*, the district court erred in relying on Light's solvency analysis.

28

**A.    The District Court Erred in Holding That JVIS's Expert's Single Method for Calculating Insolvency Was Sufficient to Demonstrate That the Notes Were Prohibited Distributions.**

Light testified that, under the method he designed, JVIS had negative shareholder equity—i.e., its liabilities exceeded its assets. Even if this Court were to accept Light's opinion on its own terms, which it should not, his calculation is insufficient to conclude that the Notes were a prohibited distribution.

That is because Light's (and the district court's) analysis ignored that Section 307(2) provides that a distribution is *not* prohibited if the LLC's assets will exceed its liabilities after giving effect to the distribution using *any* "reasonable" method. MCL § 450.4307(2). The necessary corollary to this provision is that Section 307(1)(b) *prohibits* a distribution only if *no* reasonable method would demonstrate that the company's assets exceeded liabilities after giving effect to the distribution. JVIS failed to make that showing. For this reason, Light's methodology should have been excluded as unreliable under Rule 702 and should not have concluded that JVIS met its burden at trial. *See Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 2015 WL 640875, at *3 (S.D.N.Y. Feb. 16, 2015) (excluding an expert's testimony that was based on a misinterpretation of Section 12(a)(2) of the Securities Act, concluding that Rule 702 and *Daubert* require exclusion where the "interpretation of [the underlying statute] is incorrect as a matter of law" (cleaned up)); *Exela Pharma Scis., LLC v. Eton Pharms., Inc.*, 2022 WL 806524, at *2-3 (D.

29

Del. Feb. 8, 2022) (excluding expert opinion that depended "on an incorrect legal theory").

This fundamental shortcoming in the evidence is illustrated by imagining the common scenario in which a company *defends* a distribution or similar transaction against a claim that the transaction should be rescinded. Facing a claim that, under one analysis, the transaction rendered the company insolvent, the company may defend the transaction by showing a different, reasonable method showed that assets exceeded liabilities after giving the transaction effect.

What happened here is the opposite of that common scenario. Years after it distributed the Notes, made payments on them, and reaffirmed them through the 2020 Amendments, JVIS suddenly asserted for the first time that it had acted illegally all along. It supported that position by presenting only a single method purportedly demonstrating its insolvency. If a creditor or member had sought to invalidate the Notes using that same argument, the claim would fail as a matter of law. That is because JVIS could defend the Notes by pointing to any other reasonable method, such as the method it used in compiling its own financial statements, that plainly would show solvency. *See, e.g.*, *Klang v. Smith's Food & Drug Ctrs., Inc.*, 702 A.2d 150, 153 (Del. 1997) (rejecting effort by shareholder to rescind repurchase agreement based on balance sheet insolvency where non-balance sheet method showed solvency); *In re Chemours Co. Derivative Litig.*, 2021 WL 5050285, at *1

30

(Del. Ch. Nov. 1, 2021) (rejecting effort by shareholder to recover share repurchase and divided payments alleged to exceed statutory surplus where GAAP financial statements showed solvency).

This litigation presents the oddity of the company itself—not its members or creditors—seeking to invalidate its *own* distribution on the grounds that it had allegedly violated the statute in issuing the Notes. JVIS persisted in this argument (and the district court allowed JVIS's Counterclaim to proceed to trial) notwithstanding that JVIS's own consolidated financial statements plainly showed solvency. By allowing JVIS to escape its contractual liability in this fashion, the district court turned the statute on its head, converting it into a creditor-avoidance tool for companies to deploy if their distributed commercial paper lands in the hands of someone they would prefer not to pay.

The Court of Appeals for the Ninth Circuit reversed a district court for a similar error in *Meeks v. PRN, Inc.*, 35 F.3d 571 (Table), 1994 WL 467991 (9th Cir. Aug. 30, 1994). There, the plaintiff sued based on a stock purchase agreement he had entered with the defendant company. The district court granted summary judgment to the company, finding that the agreement had caused the company's liabilities to exceed its assets, rendering the contract void under Oregon Compiled Laws § 60.181(3), a provision that is in effect identical to Section 307(1)-(2). The *Meeks* trial court concluded that the company's directors had used no reasonable

31

method to determine solvency, and based that holding in part on the fact that the company's balance sheet showed liabilities exceeded assets. *Id.* at *1.

In reversing, the Ninth Circuit explained that the district court had erred by ignoring that the statute permitted a distribution if, under any reasonable method, assets would exceed liabilities after giving the distribution effect. *Id.* at *1. The trial court had not ruled out all reasonable methods, and therefore had inappropriately determined that the contract was invalidly issued. Among reasonable considerations that the district court had improperly ignored, the Court of Appeals noted that the company's balance sheet "may not have reflected some of its most valuable assets," such as goodwill. *Id.* at *1.

Here, the district court similarly erred by concluding that Light's calculation was sufficient evidence of insolvency, despite JVIS's failure to demonstrate that the Notes could not be justified under any reasonable method. Indeed, the error here is more pronounced than in *Meeks*, because JVIS's own consolidated balance sheets indisputably showed its assets exceeded its liabilities after giving effect to the Notes. (Pl's Tr. Ex. 10, JVIS June 2017 Workbook, RE 282-8, PageID.5043 (showing JVIS's combined assets exceeded its liabilities by over $2 million after giving effect to the Notes).) As such, the district court did not have to assess whether another, unstated reasonable method might demonstrate solvency—the record evidence showed that a statutorily permissible method did exactly that.

32

When the Agent presented this deficiency in Light's analysis to the district court through a Rule 702 motion, the district court dismissed the argument by stating that even though Light had not used a GAAP balance sheet or taken a consistent approach to JVIS and Manufacturing, Section 307(2) provides that an LLC may use any method that is reasonable under the circumstances to determine that a distribution is not prohibited. That erroneously conflated the argument that Light's mix-and-match analysis is not reasonable, *see infra*, with the separate point that because Light had analyzed JVIS's solvency under only one single method, his opinion was not useful for assessing whether the Notes were prohibited distributions under Section 307.

### B.   The District Court Erred in Relying on JVIS's Expert's Testimony Because the Expert Failed to Consider JVIS's Total Assets.

JVIS's failure to meet its burden of demonstrating that the Notes were prohibited distributions extended beyond the limited scope of Light's analysis. Because Light ignored JVIS's intangible assets, his calculation failed to comply with the plain language of Section 307(1)(b), which provides that a distribution is prohibited only if it causes the limited liability company's total liabilities to exceed its ***total assets***. MCL § 450.4307(1)(b). Balance sheets often report assets at their book value rather than at their current market value. And certain intangible assets, such as a trained workforce and longstanding customer relationships, often are not reflected on a company's balance sheet at all, even though a buyer may be willing

33

to pay substantial amounts for them. (Transcript, RE 273, PageID.4773-74, 35:21-36:10; Transcript, RE 270, PageID.4584-85, 73:12-14, 73:25-74:4.) The financial statements on which Light relied did not include the value of intangible assets. (Transcript, RE 270, PageID.4665, 154:6-11.) But Light concededly did not value JVIS's intangible assets, and therefore could not assess whether JVIS's total liabilities exceeded its total assets. *See Meeks*, 1994 WL 467991, at *1 (recognizing intangible assets as relevant to statutory analysis).

As discussed, the statute allows an LLC to determine that a distribution is *not* prohibited—i.e., that a distribution is permitted—using "financial statements prepared on the basis of accounting practices and principles that are reasonable under the circumstances." MCL § 450.4307(2). That is, a company may use its GAAP financial statements to justify a distribution, even without taking into account intangible assets. In this case, JVIS's consolidated financial results support that exact conclusion, as its balance sheet assets exceeded its balance sheet liabilities by over $2 million even without considering the Company's intangible assets. (Pl's Tr. Ex. 10, JVIS June 2017 Workbook, RE 282-8 at PageID.5043.)

Although the statute provides that an LLC can use GAAP balance sheets to determine that a distribution is permissible, it does not follow that a company can repudiate its own distribution by simply ignoring certain assets, as JVIS did here.

34

That was one of the logical flaws the Ninth Circuit identified in reversing the district court's invalidation of a distribution in *Meeks*. 1994 WL 467991, at *2.

The district court appeared to rely on Light's testimony, unsupported by any data or analysis, that any intangible assets would be immaterial because they were "not readily liquid," and that Light had not considered potential off-balance sheet liabilities. But Section 307 does not require that assets be readily liquid to be included in the "total assets" calculation, and the fact that the statute expressly provides that a company can use a fair valuation to make the assessment demonstrates that the relevant analysis is not so constrained. MCL § 450.4307(2).[3] Indeed, the collateral for the Notes expressly included JVIS's intangible assets, so the original parties to the Notes—JVIS and Winget—plainly ascribed value to them. (Pl's Tr. Ex. 56, Security Agreement, RE 282-19, PageID.5395; Pl's Tr. Ex. 58, UCC Filing Statement, RE 282-20, PageID.5400.)

---

[3] Federal courts recognize that a "going concern," rather than a liquidation premise of value is appropriate when a company remains in operation. *See, e.g.*, *In re Clouter Creek Reserve LLC*, 669 B.R. 764, 786-87 (D.S.C. Bankr. 2025). The district court incorrectly found that the Agent's expert, Meinhart, "argued that [Light] should have assessed the company using a 'liquidation' premise rather than 'going concern' premise." (Opinion, RE 291, PageID.5884.) In fact, Meinhart merely stated that Light used a going concern premise in valuing Manufacturing. (*See* Transcript, RE 273, PageID.4793.) That contrasts with Light ignoring JVIS's intangible assets on the grounds that they were not readily liquid.

Light's testimony that he also did not consider whether JVIS also had liabilities not reflected on the balance sheet does not excuse his failure to value the company's intangible assets, as the statute *requires* consideration of total assets and total liabilities. MCL § 450.4307(1)(b). To the contrary, this decision further underscores that his calculations did not comply with the Act's plain language. And his decision to ignore intangible assets is particularly notable given that Light himself had previously valued the very same company, JVIS, in the 2017 Valuation as of only a year earlier, and reached the opposite conclusion. (Pl's Tr. Ex. 62, 2017 Valuation, RE 282-22, PageID.5420 ("[JVIS] possesses intangible asset value").)[4] This about-face as to JVIS's solvency can only be explained by the fact that he designed an unprecedented and baseless methodology with the goal of reaching his specific conclusion. A bankruptcy court in the Southern District of New York

---

[4] The district court relied on Light's attempt to explain away his prior valuation work based on Light's testimony from the stand that 2016 was the "best year ever" for the auto industry and that JVIS had not yet issued the Notes at the time of the 2017 valuation. (RE 291, PageID.5882.) But even if 2016 was a better year for the auto industry than 2017, there was no evidence that the industry or JVIS experienced a substantial decline in the intervening year such as to wipe out over $230 million in value—the decline it would take from Light's $386 million valuation of JVIS as of 2016 for a $150 million note issuance to exceed the Company's market value. In fact, evidence directly refuted that point. Comparing the schedules to the 2017 Valuation to JVIS's 2017 balance sheet shows the book value of JVIS's reported balance sheet assets as of June 30, 2016 was $186.7 million; for June 30, 2017, the same figure was a modestly smaller $175.6 million, *after* deducting the first $25 million of payments on the Notes from the Company's assets. (*Compare* Pl's Tr. Ex. 62, 2017 Valuation, RE 282-22, PageID.5451 *with* Pl's Tr. Ex. 10, JVIS June 2017 Workbook, RE 282-8, PageID.5043.)

36

rejected an expert's opinion under similar circumstances in *In re Lyondell Chemical Co.,* 567 B.R. 55, 65 (Bankr. S.D.N.Y. 2017), where the expert had found solvency in 2009 under one method, but "by 2011, when [he] was working on [the] litigation … had completely changed his opinion to conclude [the same entity] was insolvent." *Id.* at 65, 95 (when experts "dramatically change their opinions for litigation purposes, it tests credibility to accept the litigation opinions"); *see also In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig.*, 341 F. Supp. 3d 213, 260 (S.D.N.Y. 2018) (Fed. R. Evid. 702 does not permit "conclusion-driven" analysis).

## C. JVIS's Expert's Method Was Not Reasonable Under the Circumstances.

### 1. JVIS's Expert Unreasonably Combined Book Value and Market Value, Resulting in a Meaningless Calculation.

The district court further erred in permitting Light to testify and in relying on Light's analysis at trial because Light reached his conclusion only by using an unreasonable combination of book value of balance-sheet assets for JVIS and a purported market valuation of Manufacturing. This made-for-litigation combination of methods cannot support the conclusion for which it was offered, because there is no logical basis for combining the two components in order to calculate the difference between JVIS's total assets and total liabilities. Light's mash up resulted in a meaningless number, and therefore is not a "reasonable method under the circumstances," as the statute requires.

37

The district court acknowledged that Light used two different approaches, but accepted his explanation that it is reasonable to treat Manufacturing separately from JVIS because Manufacturing is a wholly-owned subsidiary, and a parent company does not own the assets of its subsidiaries. (RE 291, PageID.5890.) That logic confuses legal title to the assets with economic control over them. There is no question that JVIS, as the sole shareholder of Manufacturing, can instruct Manufacturing to distribute funds to the parent, to liquidate, or to engage in an asset sale and direct all the proceeds to the parent company. Economic control is what's relevant for valuation purposes, not legal title. (Transcript, RE 273, PageID.4822, 84:3-9.)

Moreover, it does not follow that treating Manufacturing as an individual asset of JVIS rather than consolidating its results would justify using a different method to value that single asset from what Light applied to all JVIS's other recorded assets. There is no reason—other than a desire to reach an insolvency conclusion—to mix book value for JVIS with a purported market value for Manufacturing. As the Agent's rebuttal expert explained, "[W]e have to make a choice. Are we just going to assume that the value is equal to book value, or are we going to go through and conduct a valuation? And what I'm seeing with Light's work is that he is doing both….that's clearly not the appropriate way to do it or the correct way to do it." (RE 273, PageID.4781, 43:6-22.) Because Light's novel mix-and-match calculation

38

was wholly unreliable, its result does not support JVIS's assertion that the Notes were prohibited distributions.

### 2. JVIS's Expert's Market Valuation Employed Unreasonable and Incorrect Assumptions.

In addition to committing legal error by accepting Light's testimony despite his failure to comply with the statute in multiple respects, the district court also abused its discretion by accepting Light's calculation after the Agent demonstrated that correcting just two flaws in his valuation of Manufacturing to bring them in line with Meinhart's testimony and Light's prior valuation work flipped Light's ultimate conclusion from "insolvent" to "solvent."

Those two corrections involved the "discount for lack of marketability" and a "size adjustment factor." Both of these factors, which Light testified he selected based on his own judgment, substantially lowered his concluded value for Manufacturing, which in turn allowed him to reach his ultimate conclusion of JVIS's insolvency. Meinhart explained why both assumptions were methodologically unsound, unsupported by the facts, and dramatic departures from the assumptions that Light had used when he valued JVIS for non-litigation purposes. Notably, in cross examining Meinhart, neither Defendant contested his specific critiques of Light's discount for lack of marketability or his size adjustment factor.

In cross examining Light, by contrast, the Agent demonstrated that modifying only these two purely discretionary factors Light selected—even without changing

39

other assumptions and methodological approaches that Meinhart had also critiqued, flipped the outcome of Light's analysis from negative ("insolvent") to positive. (Transcript, RE 270, PageID.4630-55.) Notably, Light's litigation analysis on these two factors departed from his non-litigation valuation of JVIS, making them unsound even under Light's own pre-litigation understanding, but Meinhart's testimony supported further adjustments that would have increased the conclusion of value still more.[5] On cross, Light stated that he did not agree with Meinhart's criticisms, but acknowledged that "the math tracks." (Transcript, RE 270, PageID.4630-55.)

Light attempted to justify his choice to select a 40% lack of marketability discount for a controlling interest in Manufacturing (up from the 25% discount he used when valuing a non-controlling interest in JVIS in 2017), by the existence of "charging orders" against JVIS. (Transcript, RE 270, PageID.4603, 92:21-23 ("Q: The charging order, that's a material development in your view? A: Yes.")) However, the record indisputably shows that the Agent did not seek the charging order against the Trust's membership interest in JVIS until June 2018. (Mot. for Charging Order, 2008 Case ECF 805-06), meaning the charging order did not yet

---

[5] The Agent also demonstrated at trial that adjusting another discretionary factor that Meinhart critiqued, a "company-specific risk premium" would have raised his conclusion of value still further, but that adjustment was not needed to tip Light's ultimate calculation from negative positive.

exist as of Light's June 2017 valuation date and therefore is irrelevant to valuation. Light attempted to backfill the gaping chronological hole in his opinion by stating—without analysis or data—that he could not think of any "less marketable" company. (Opinion, RE 291, PageID.5882.) The district court relied on that statement and its own speculation to excuse Light's reliance on the non-existent charging liens, stating "the well-known chronology of this case easily demonstrates that all of JVIS-USA's interests labored in the shadow of the substantial judgment possessed by Chase."[6] (RE 291, PageID.5891.) It was an abuse of discretion to adopt Light's discount despite his erroneous reliance on charging liens that did not exist at the relevant time and his dramatic departure from his prior valuation based only on Light's *ipse dixit* and the district court's own unquantified speculation.

The district court likewise erred in allowing Light to reduce his calculated guideline-companies valuation of Manufacturing by more than half by using a "size adjustment factor" that bore no relationship to the underlying "comparable companies" on which he purported to base his calculations. Although Light testified

---

[6] Tellingly, just one paragraph before the district court used the long history of this litigation to justify Light's inflated discount, it had adopted his statements that looking at potential off-balance sheet liabilities such as lawsuits "would have required unreliable speculation." (RE 291, PageID.5891.) The court's pivot from finding litigation too speculative to value for JVIS to providing its own speculation as to the value of litigation for Manufacturing reveals the inherently results-driven illogic of the insolvency finding.

that the idea behind a guideline-companies valuation was to use "some measure of central tendency"—i.e. mean and median—from performance metrics of publicly traded companies and apply them to the company subject to valuation, Light only used the metrics from the lowest performing 10% of companies in the set he selected, and then further reduced that result by more than half using his "adjustment factor" that he selected without reference to any data or analysis. (Transcript, RE 270, PageID.4532, 21:10-18 (Light explaining that guideline public companies method involves applying "measure of central tendency"); RE 273, PageID.4803-04 (Meinhart explaining Light had not used measures of central tendency); *Id.* PageID.4808-20 (Meinhart explaining effect of adjustment factor).)

Meinhart explained that because of Light's unreasonable downward adjustment, Light's guideline-companies conclusion of value was "based on a multiple that is so different from the market data that [Light had] been pointing to"— i.e., from the "guideline" companies Light had selected—"that there is no connection" between "the concluded value and the market data."[7] (RE 273, PageID.4820, 82:2-6.) The district court did not explain why it was appropriate to

---

[7] In showing the mathematical effect of Light's downward adjustment factor on his ultimate conclusion, the Agent changed *only* the size adjustment factor, leaving Light's decision to use the bottom decile of guideline-company multiples in place, although Meinhart also criticized that selection, and it conflicted with Light's description of the methodology as relying on a measure of central tendency.

accept Light's new, value-reducing size adjustment factor despite the disconnect between that factor and the concept of a guideline-companies valuation. *See In re Paoli R.R. Yard PCB Litig.*, 1992 WL 323531, at \*10 (E.D. Pa. Oct. 21, 1992) (excluding analysis that "altered an accepted methodology to such a point so as to render its methodology unreliable under Rule 702").

Rather than providing a reasoned basis for allowing Light's judgment to prevail not only over Meinhart's criticism, but also Light's own prior valuation approach, the district court merely brushed aside Meinhart's counterpoints as "different techniques," and then faulted the Agent for not putting forward its own "alternative valuation[]." (Opinion, RE 291, PageID.5892-93.) As discussed *infra*, that highly misleading characterization of the Agent's proofs was, at best, an exercise of improper burden shifting.

### D. The District Court Erred in Finding That the Agent Had Not Presented Any Evidence of JVIS's Solvency.

Finally, the district court justified its insolvency conclusion based in part on its finding that the Agent had not "offered any alternative valuations," and the Agent's rebuttal expert confirmed on the stand that he had not offered his own independent valuation opinion. (Opinion, RE 291, PageID.5892-93.) Fundamentally, this was improper burden shifting. The Agent had no obligation to put forward its own valuation, particularly when JVIS's only evidence of insolvency was at odds with the statute, valuation principles, and the record.

43

Nonetheless, the district court was wrong. The Agent *did* demonstrate JVIS's solvency using the best possible evidence: JVIS's own contemporaneous financial statements, which showed that, after giving effect to the Notes, JVIS's assets exceeded its liabilities by $2,091,846.47. (Pl's Tr. Ex. 10, JVIS June 2017 Workbook, RE 282-8 at PageID.5043.) The district court's decision to ignore JVIS's own financial statements in favor of a calculation that Light created solely for this litigation was not a failure of proof by the Agent, but a legally erroneous application of Section 307.

Moreover, as discussed, the evidence presented by the Agent showed that Light had valued JVIS at over $386 million just one year before the Notes' issuance. And even Light acknowledged that, when the calculations were adjusted to fix just two of the issues identified by the Agent's expert, the solvency analysis flipped. (Transcript, RE 270, PageID.4630-55.) Simply put, by taking Light through that calculation, the Agent presented an "alternative valuation," showing that even Light's unreasonable mix-and-match methodology would show solvency with minor adjustments that were thoroughly supported by Meinhart's testimony and consistent with Light's own non-litigation valuation of JVIS. The fact that the Agent did not additionally put forward a third alternative valuation on top of all this evidence does not change that the Agent amply demonstrated that JVIS's assets exceeded its liabilities.

44

### III. The District Court Erred in Not Barring the Counterclaim Under Unclean Hands and Waiver.

In addition to the myriad errors underlying the district court's solvency determination, the court abused its discretion in failing to apply the Agent's defenses of unclean hands and waiver to bar JVIS's Counterclaim.

This case presents a textbook fact pattern for applying these doctrines. JVIS came to the court invoking its own purported illegal conduct to escape payment on the Notes, doing so only after this Court affirmed the Notes' assignment to the Agent and after JVIS, in concert with Winget, amended the Notes with the express goal of thwarting the Agent's efforts to recover on them. JVIS's decision to invoke its statutory argument only once the Notes were in the Agent's hands reeks of gamesmanship and bad faith, and should have been barred at the courthouse door.

Discovery revealed JVIS's already audacious request for judicial relief as truly shocking. In discovery, the Agent learned that JVIS had made an additional $22.5 million in payments to Winget on the Notes. This had not been disclosed to the Agent or the courts. Remarkably, JVIS did not seek to recover that amount from Winget when seeking to recover from the Agent the $22.5 million in payments that the Agent had already received. (2008 Action, Reconsideration Order, Dkt. 1240, PageID.36034, PageID.36038.) That is, JVIS sought relief from its outstanding obligations on the Notes and requested a court order to recover payments that were already in the Agent's hands, while knowingly letting $22.5 million of payments to

45

Winget on the same Notes sit undisclosed and without making any effort to recover them.

Worse yet, discovery also revealed, through the Crime-Fraud Documents, that JVIS and Winget amended the Notes with the express intent to hinder the Agent's recovery efforts, and did so at a time when JVIS instead could have avoided further payments to Winget by citing its purported belief that the Notes were unenforceable. Of course, JVIS did not characterize the Notes as invalidly issued when Winget held them for several years. Instead, JVIS deployed this theory only when the Agent—by order of this Court—was given the Notes and sought to enforce them six years later. The district court erred in assisting JVIS's and Winget's campaign of non-payment.

## A.   Unclean Hands Bars the Counterclaim.

Unclean hands applies to "any willful act in regards to the matter in litigation which would be condemned and pronounced wrongful by honest and fair-minded [individuals.]" *Rose v. Nat'l Auction Grp., Inc.*, 646 N.W.2d 455, 463 (Mich. 2002) (cleaned up). A court applying the doctrine "looks at the whole situation" because JVIS—seeking equitable relief—"must come in with clean hands." *McFerren v. B & B Inv. Grp.*, 655 N.W.2d 779, 783 (Mich. Ct. Ap. 2002) (citation omitted).

JVIS does not have clean hands. The Crime-Fraud Documents show that JVIS schemed to thwart the Agent's collection. That scheme began no later than June 3,

46

2020—around the time the Agent moved to collect the Notes—when counsel for Winget shared a memo with JVIS stating, "we need a strategy to prevent Chase from enforcing the notes" (Pl.'s Tr. Ex. 106, RE 282-28, PageID.5475.), and stressed that because the Agent's "request to claw back the notes … is currently fully briefed … [t]ime is of the essence." (*Id*. at PageID.5476.)

Participating in this plan, JVIS responded by stating that the security agreement covering the Notes "grants a security interest in essentially all assets of JVIS-USA," and conspicuously noted that "as long as the Notes are held by Winget or the Trust, the Security Interest created by the [security agreement] unarguably secures the Notes." (Pl's Tr. Ex. 107, RE 282-29, PageID.5488; Pl's Tr. Ex. 112, RE 282-34, PageID.5499.) JVIS also made clear that "if [the Agent] eventually gets a final order entitling it to the notes, [and] if [the Agent] discovers the security interest (UCC is on file), it may try to claim it is also entitled to the security interest." (Pl's Tr. Ex. 107, RE 282-29, PageID.5488) As a result, JVIS determined, "[i]t may be prudent to rescind the loan and security agreement at this juncture." (*Id.*) Soon after, JVIS authored a memo regarding the security agreement, and concluded that the Agent could likely make the "strong[] argument" that the security interest in the Notes "should automatically follow the Note[s] by operation of law." (Pl's Tr. Ex. 112, RE 282-34, PageID.5500.)

47

Acting on that conclusion, JVIS collaborated with Winget to draft the Amendments (*see* Pl's Tr. Exs. 115-121, RE 282-37-43), which, in counsel's words, aimed to "thwart[], for at least the next 3 years, [the Agent's] ability to enforce the notes." (Pl's Tr. Ex. 106, RE, 282-28, PageID.5475-76.) And as expressly contemplated, JVIS and Winget allowed the security agreement to lapse before the Agent took possession of the Notes. (RE 291, PageID.5914; *see also* RE 268, PageID.4198, 79:6-10 (trial testimony admitting that the security interest was not renewed).).

It is difficult to image clearer evidence of unclean hands. JVIS knew the Agent was seeking to enforce the Notes, knew that the security agreement covered the Notes, and knew that the agreement traveled with the Notes. So to keep the Notes and security away from the Agent, JVIS let the agreement lapse and "participated in th[e] amendments." (RE 291, PageID.5904.) The district court correctly determined that the Amendments were voidable transfers under Michigan law because Winget *and* JVIS "had an 'actual intent to hinder [or] delay'" the Agent. (*Id.*) The unclean hands doctrine thus bars the Counterclaim.

The district court's decision not to apply unclean hands was an abuse of discretion. First, the court found that the actions and statements described above do not demonstrate "bad faith." (RE 291, PageID.5913.) Instead, the district court found that JVIS did "whatever it could to preserve its business in the face of the looming

48

enforcement of a debt obligation that formerly was in friendly hands, but that turned sinister through unanticipated legal developments." (*Id.* at PageID.5914.)

As an initial matter, Michigan law makes clear that the very purpose of preventing voidable transfers is to stop the transfer of "property in ***bad faith*** before creditors can reach it." *Dillard v. Schlussel*, 865 N.W.2d 648, 656 (Mich. Ct. App. 2014) (emphasis added) (citation omitted). And as the district court itself concluded, JVIS specifically tried to "thwart[], for at least the next 3 years, [the Agent's] ability to enforce the notes" by participating in the Amendments. (RE 291, PageID.5887-88.) The court's own conclusions, therefore, supported finding bad faith.

In any event, the district court's language improperly cast as "sinister" the Agent's lawful attempt to use the judicial process to collect on a significant judgment the district court awarded and this Court affirmed. (*Id.* at PageID.5914.) Far from justifying JVIS's conduct, the court's explanation that JVIS treated the Notes differently when not "in friendly hands" highlights that JVIS's shifting characterization of the Notes' depended on who held them. (*Id.*) To the extent there is any truth in the court's finding that JVIS was doing "whatever it could to preserve its business," a desire to preserve a business is not a license to engage in fraudulent transfers. (*Id.*)

Second, the district court erred by declining to apply unclean hands by stating that "[t]esting the validity of the notes when the Agent demanded payment, under

49

the circumstances presented by the evidence, does not show that JVIS-USA's counterclaim is tainted with inequitableness or bad faith." (RE 291, PageID.5914.) Even if there were a legitimate question as to the validity of the Notes, JVIS's decision to "test" that issue only once "the Agent demanded payment," rather than when they were originally issued, or even when they were later amended in 2020, is the essence of bad faith. Simply put, JVIS chose to honor its obligations when doing so benefited Winget, and paid him a total of $45 million in connection with them. But JVIS repudiated those very same obligations when they were assigned by the court to Winget's judgment creditor. JVIS's selective "testing" of the Notes' validity is just a euphemism for gamesmanship.

## B.    JVIS Waived the Counterclaim.

The facts demonstrating JVIS's unclean hands also demonstrate waiver—i.e., "a party's decisive, unequivocal conduct reasonably inferring the intent to waive." *Reed Est. v. Reed*, 810 N.W.2d 284, 290 (Mich. Ct. App. 2011).

The Counterclaim asserts that the Notes were invalid when issued. But JVIS waived any such claim on multiple occasions.  It paid $45 million on the Notes in multiple installments in 2017 and 2018 and then reaffirmed them through the 2020 Amendments. (RE 291, PageID.5888) A "voluntary and unqualified payment" is "the best evidence" that defendant intends to waive his legal rights and "perform his moral obligation to pay the whole of the just debt." *Hiscock v. Hiscock*, 240 N.W.

50

50, 54 (Mich. 1932); *see also Charbonneau v. Mary Jane Elliott, P.C.*, 611 F. Supp. 2d 736, 741 (E.D. Mich. 2009). The payments were "an acknowledgment of the continued existence of the debt." *Id.* at 741.

JVIS again waived any opportunity to challenge its own issuance of the Notes when it amended them in June 2020, stating that each Note "shall remain in full force and effect, as amended hereby." (Pl's Tr. Ex. 3, RE 282-3, PageID.5030; Pl's Tr. Ex. 4, RE 282-4, PageID.5032). JVIS's decision to affirm the Notes "is inconsistent with any other intention than to waive" any potential challenge to its own decision to issue them. *Reed*, 810 N.W.2d at 290 (citation omitted).

The district court avoided this straightforward conclusion by finding that "the defendants all believed that the notes memorialized loans made from past distributions," and as such, "[t]here was no reason for them to consider the notes as new distributions." (RE 291, PageID.5910.) According to the court, that meant the "payments made on them cannot imply or infer an acknowledgement of their validity that affected the right to contest that fact when the landscape shifted." (*Id.*)

That explanation cannot be squared with the undisputed fact that JVIS expressly acknowledged the $135 million Note was a "distribution" in a 2018 company document signed years before the Agent received the Notes. (Pl's Tr. Ex. 6, RE 282-6, PageID.5037.) JVIS's post-hoc, litigation-driven characterization is irrelevant to the waiver analysis. Instead, the question is whether JVIS intentionally

51

waived any opportunity to challenge the issuance of the Notes when it made $45 million of payments and later declared they "remained in full force and effect." It plainly did.

## IV.   The District Court Committed Legal Error in Refusing to Award the Agent Damages Up to the Point of JVIS's Purported Insolvency.

The Counterclaim and breach of contract claim should not have reached trial. And the district court's conclusion that the Notes rendered JVIS insolvent is erroneous. But even if the district court's analysis were correct, the Agent would nonetheless be entitled to recover the value of the Notes up to the point of purported insolvency. Put differently, the district court should have allowed the obligee of the Notes—i.e., the Agent—to enforce them up to the amount by which the Notes purportedly rendered JVIS insolvent. Using JVIS's expert's calculation, the Agent should have been allowed to recover at least $138,053,220 plus interest, less the payments made and delivered to the Agent.

That result is consistent with the overall structure of Michigan's LLC Act, which allows an LLC to make a distribution up to the point of its surplus, MCL § 450.4307(1)(b), and provides that an LLC can recover from the members or managers who authorized a prohibited distribution, MCL § 450.4308(1). Importantly, that recovery is limited to "the amount of the distribution that exceeds what could have been distributed without violating" Section 307. MCL § 450.4308(1). Similarly, Section 307(5)(a) provides that an otherwise prohibited

52

distribution of an obligation to make future payments to a withdrawing member is not wholly void ab initio, but instead, "[t]he portion of the obligation that could have been distributed without violating subsection (1) is indebtedness to the withdrawing member." MCL § 450.4307(5)(a). Because JVIS's own analysis shows the Company could have distributed Notes up to $138 million, it was an abuse of discretion for the district court to declare the Notes wholly unrecoverable in the Agent's hands. Alternatively, but under the same reasoning, the Agent is entitled to the amount owed under the $135 million Note only.

Courts interpreting statutes similar to the Act have followed this approach. For example, like the Act, Colorado statute provides that a "director is personally liable to the corporation only for that portion of the distribution which makes the corporation insolvent." *Paratransit Risk Retention Grp. Ins. Co. v. Kamins*, 160 P.3d 307, 320 (Colo. App. 2007) (citing Colo. Rev. Stat. § 7-108-405.) Applying that provision, a director argued that "even if his … distribution rendered [an entity] insolvent, the trial court erred in failing to calculate the amount [the entity] could have distributed while remaining solvent." *Id.* The Colorado Court of Appeals agreed, and ordered the trial court, among other things, to "determine how much of the distribution, if any, could have been paid while leaving the corporation solvent." *Id.*; *see also BIGResearch, L.L.C. v. PENN, L.L.C.*, 2012 WL 2524250, at *4 (Ohio Ct. App. June 29, 2012) (similar).

53

The district court's refusal to enforce the Notes up to the point of insolvency consistent with the Act was error. First, the district court claimed that it could not enforce the Notes as such because the "equitable remedy JVIS-USA has sought is the voiding of the notes in their entirety." (RE 291, PageID.5915.) That explanation finds no support in the statute. JVIS sought its declaration of invalidity by pointing to the same statute that allows for the *partial recovery* of distributions up to the point of insolvency. And as explained above, other courts have recognized that rather than declaring a distribution void in its entirety, the appropriate path is to determine "how much of the distribution, if any, could have been paid while leaving the corporation solvent." *Paratransit*, 160 P.3d at 320.

The district court also erred in claiming that it could not enforce only the $135 million Note because the Agent "has adduced no evidence demonstrating the order in which Winget and JVIS-USA executed the notes, that is, whether they executed the $135 million note or the $15 million note first." (RE 291, PageID.5915.) The district court provided no explanation for why the order of execution of the two Notes could possibly matter. Nor does the Act provide any basis for that reasoning. Rather, as stated above, the Act allows for the recovery up to "the amount of the distribution that exceeds what could have been distributed without violating" Section 307. *See* MCL § 450.4308(1). And, whatever the order, the ultimate mathematical outcome is the same: the Agent would be awarded a total of $138,053,220 plus

54

interest, with the remaining face value of nearly $12 million on the "second" note—whichever it was—declared unrecoverable. Or, the district court could have adopted the view that because JVIS had, under its own theory, sufficient assets to permit a distribution of $135 million, fairness commends enforcing at least that Note. Indeed, an "order of signing" requirement would do nothing but promote gamesmanship in execution of related instruments.

## CONCLUSION

This Court should reverse the district court's judgment to JVIS on its Counterclaim and accompanying declaration that the Notes are invalid, and remand for calculation and entry of damages, including interest, in the outstanding amounts owed on the Notes as amended, consistent with the proofs at trial, or at least up to the point of insolvency plus interest.

Dated:  January 20, 2026

Respectfully submitted,

/s/ *James W. Ducayet*
James W. Ducayet
Kendra L. Stead
Jennifer M. Wheeler
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603

*Counsel for Alter Domus LLC*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P 28.1(e)(2)(a) because, according to the word-count feature of Microsoft Word, this brief contains 12,991 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in Times New Roman 14 point font.

Dated:  January 20, 2026

Respectfully submitted,

/s/ *James W. Ducayet*
James W. Ducayet
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603

*Attorney for Alter Domus LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 20, 2026, I electronically filed the foregoing paper with the Clerk of the Court using the ECF filing system, which will send notifications to all counsel of record.

Respectfully submitted,

/s/ *James W. Ducayet*
James W. Ducayet
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

| Record Entry | Description | Page ID # |
|---|---|---|
| 1 | Complaint | 1-9 |
| 15 | Answer to Complaint | 32-47 |
| 16 | JVIS Counterclaims | 48-57 |
| 46 | Amended Complaint | 373-408 |
| 85 | MTD Opinion | 805-825 |
| 98 | JVIS Motion for Partial Judgment on the Pleadings | 1047-1067 |
| 120 | Agent's Motion to Exclude Expert Testimony of G. Light | Filed Under Seal |
| 121 | Agent's Motion to Exclude the Expert Testimony of G. Light | 1619-1713 |
| 157 | Order on Agent's Motion to Compel Production and De-Designation of Certain Documents | 2182-2204 |
| 159-2 | ASC 810-10-10-1 | 2283 |
| 211 | Opinion and Order Denying Motions by JVIS to Amend Counterclaims and for Partial Summary Judgment on the Pleadings, and Denying Plaintiff's Motion for Partial Summary Judgment | 3249-3268 |
| 250 | Order Requiring Production of Documents Submitted to the Court for *In Camera* Review | 3751-3753 |
| 268 | Trial Transcript, Vol. 2 | 4120-4295 |
| 270 | Trial Transcript, Vol. 3 | 4512-4727 |
| 273 | Trial Transcript, Vol. 4 | 4739-4840 |

| Record Entry | Description | Page ID # |
|---|---|---|
| 280 | JVIS-USA, LLC's Proposed Findings of Fact (Post-Trial) | 4969-4989 |
| 282-1 | Pl. Tr. Ex. 1, JVIS $135M Promissory Note | 5024-5026 |
| 282-2 | Pl. Tr. Ex. 2, JVIS $15M Promissory Note | 5027-5029 |
| 282-3 | Pl. Tr. Ex. 3, First Amendment and Waiver to JVIS $135M Promissory Note | 5030-5031 |
| 282-4 | Pl. Tr. Ex. 4, First Amendment and Waiver to JVIS $15M Promissory Note | 5032-5033 |
| 282-6 | Pl. Tr. Ex. 6, Acknowledgement | 5037-5038 |
| 282-8 | Pl. Tr. Ex. 10, JVIS June 2017 Workbook | 5043-5054 |
| 282-19 | Pl. Tr. Ex. 56, Loan and Security Agreement | 5395-5398 |
| 282-20 | Pl. Tr. Ex. 58, UCC Filing Statement | 5399-5401 |
| 282-22 | Pl. Tr. Ex. 62, 2017 Valuation | 5403-5464 |
| 282-28 | Pl. Tr. Ex. 106, Memo | 5474-5486 |
| 282-29 | Pl. Tr. Ex. 107, Email | 5487-5489 |
| 282-34 | Pl. Tr. Ex. 112, Email | 5497-5500 |
| 282-37 | Pl. Tr. Ex. 115, Email | 5506-5510 |
| 282-38 | Pl. Tr. Ex. 116, Memo | 5511 |
| 282-39 | Pl. Tr. Ex. 117, Memo | 5512 |
| 282-40 | Pl. Tr. Ex. 118, Email | 5513 |
| 282-41 | Pl. Tr. Ex. 119, Bradley notes | 5514-5519 |
| 282-42 | Pl. Tr. Ex. 120, Bradley notes on drafts of promissory notes | 5520-5531 |

| Record Entry | Description | Page ID # |
|---|---|---|
| 282-43 | Pl. Tr. Ex. 121, Bradley handwritten notes on emails | 5532-5543 |
| 282-62 | Pl. Tr. Ex. 140, Bradley handwritten notes on executive summaries | 5622-5628 |
| 291 | Opinion after trial | 5869-5916 |
| 292 | Judgment | 5917 |
| 293 | Agent's Notice of Appeal | 5918-5920 |